UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA

In re:

Steven Dale Deaton,

        Debtor.
_____/

MXR Imaging, Inc.,

        Plaintiff,

v.

Steven Dale Deaton,

        Defendant.
_____/

Chapter 7
Case No. 23-02527-5-PWM

Adversary Proc. No.

_____

## COMPLAINT TO DETERMINE NONDISCHARGEABILITY OF INDEBTEDNESS UNDER 11 U.S.C. § 523

Plaintiff MXR Imaging, Inc. ("MXR"), by counsel, for its Complaint to Determine Nondischargeability of Indebtedness under 11 U.S.C. § 523 (this "Complaint") against Defendant Steven Dale Deaton ("Debtor"), alleges and states as follows:

### PRELIMINARY STATEMENT

1. This Complaint seeks a determination that certain debts owed to MXR by Debtor are nondischargeable in the above-captioned bankruptcy case pursuant to 11 U.S.C. § 523.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

### Parties

5. MXR is a California corporation with its principal place of business in San Diego, California.

6. Debtor is an individual who, according to the docket in the above-captioned bankruptcy proceeding, resides at 12201 Beestone Lane, Raleigh, NC 27614.

### MXR's business and PACS software

7. MXR was founded in 1956 and has grown to become one of the nation's largest independent providers of sales, service, training, parts, and supplies for diagnostic imaging equipment. The MXR product portfolio includes new, used, and reconditioned equipment for x-ray, ultrasound, computerized tomography (i.e., CT scan), Magnetic Resonance (i.e., MRIs), Digital Radiography, and Computed Radiography probes. MXR has locations and employees strategically located throughout the United States to provide sales and service support to its customers.

8. MXR provides support to healthcare organizations of all sizes related to their use of medical imaging technology, including Picture Archiving and Communication Systems ("PACS"), a type of software that stores and transmits patient information captured by medical imaging devices and allows such information to be accessed by healthcare professionals across an institution (or multiple institutions). A PACS system is a more efficient, cost-effective, and safe alternative to physical files.

9. Typically, a PACS system operates by storing information in a cloud, i.e., on a

remote computer server not located onsite at a healthcare organization.[1] Once a healthcare professional uploads medical imaging files to the system, it may be accessed remotely by others with the proper login credentials (such as specialists, family doctors, and urgent care workers).

10. An example helps explain how this system works in practice: A technician takes scans of a patient's arm using an x-ray machine, which uploads the x-ray images to the PACS system used by the hospital. A radiologist located in another building logs into the PACS system on a computer, locates the patient's information, and views the x-rays in order to diagnose a bone fracture.

11. Because medical imaging files are uploaded to and later accessed from remote computer servers, a PACS software provider must ensure that the servers are maintained. If the servers shut down or otherwise fail, then the customer will be unable to access patient information that was uploaded using PACS software.

12. PACS software is highly configurable and can be modified to better suit a particular customer's needs. For example, in addition to patient records containing medical imaging, some PACS software also stores and transmits information regarding patient scheduling, billing, medical notes, and final reports/results.

13. MXR matches its healthcare organization customers with a PACS system that supports their needs. MXR uses its knowledge of a customer's medical practice on the one hand, and its knowledge of and experience with various service providers in the PACS marketplace on

---

[1] *See* "Cloud Computing," *Black's Law Dictionary* (11th ed. 2019) ("The practice of sharing computing resources via the Internet; esp., the practice of accessing, sharing computing resources via the Internet; esp., the practice of accessing, manipulating, processing, and storing data on a remote server. Cloud computing is an elastic, measured service offering on-demand, self-service access to computational resource pooling through Internet-capable devices.").

the other, to recommend an effective, reliable, and affordable solution.

14. The process of vetting PACS software providers is critical. As medical providers in possession of the confidential healthcare records of their patients, MXR's customers must maintain compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Any PACS software used by these providers must also be HIPAA compliant.

15. MXR would then work with a PACS provider to offer guidance on designing the particular iteration of PACS software based on the needs of the institution to be used by the MXR customer, including which features to include, how much data storage is needed, and what specific medical imaging equipment would need to have the PACS installed on it. Oftentimes, MXR will sell the customer such equipment with the PACS software already installed and ready to use.

**MXR begins working with EvoHealth to provide
its customers with PACS software solutions**

16. Debtor is the Chief Executive Officer of EvoHealth LLC ("EvoHealth") and, upon information and belief, its sole member.

17. EvoHealth is a PACS software provider.

18. In January 2022, Debtor, on behalf of EvoHealth, began accepting purchase orders from MXR where EvoHealth would act as a contract manufacturer of PACS software and provide related services for MXR's customers.

19. EvoHealth agreed to install PACS software in accordance to the institutions workflow/needs and maintain servers and/or databases to provide related services to the following customers of MXR: Acute Care Surgery of Texas, Altoona Lung Specialists, Boyette Ortho, Brahams Cohn & Leb, DRS, Cape Fear, Carolina Donor Services, Central North Alabama Health Services, Cleveland Cliffs Burns Harbor, LLC, CNY Family Care, Coastal Orthopedics & Sports Med, College of Healthcare Professions, Cornerstone Regional Hospital, Crimson Urgent Care,

4

Daytona Heart Group, Family Health Centers, Inc., FASTMED Clinics Urgent Care, First Choice Community Health Center, First Physicians, First Response Urgent Care, Florida State Hospital, Gutierrez MD, Marco & Associates, Hagerstown Correctional Facility, Kidney Hypertension & Transplant Spec., Kids Choice Pediatric Orthopedic, Leighton Orthopedic, Little Alsace Urgent Care, Mandy's Primary Healthcare, Meridian Medical Services FNC, Monticello Medical, Morrilton Medical, Norton Family Practice, Olsen Orthopedics, Orthopedic Specialty Clinic, Providence Imaging Center, Inc., Pulmonary & Critical Care Cons, Southwest Orthopedic Clinic, Springfield Family Physicians LLP, Surgery Center of Fairbanks, Terry Reily Health, Texas Tech. Athletics, TRI-County Orthopedic Group PC, and Wilson Community Health Center (hereinafter collectively referred to as "customers").

20. MXR has cultivated business relationships with its customers for over fifty years and holds these relationships in the highest regard.

21. MXR was the source of bringing its customers directly to EvoHealth. The customer would sign MXR's contract and MXR would issue a purchase order to EvoHealth for bringing EvoHealth the customer. In some circumstances, MXR's customer would sign EvoHealth's contract.

22. At the inception of the MXR and EvoHealth business relationship, Debtor attended MXR's 2019 Regional Meeting and provided the MXR Sales Team a Power Point stating that EvoHealth provides a "stable product" and "experience with how to support you and your clients."

23. After attending MXR's Regional Meeting in 2019, Debtor began serving as a paid sponsor to MXR's National Sales Meetings. But in 2023 he did not pay for the sponsorship and reaped the benefits of free marketing and dedicated meeting time with the entire MXR Sales Team.

24. At the 2023 National Sales Meeting, Debtor continued to make promises to MXR

executives and sales personnel knowing that he would not be able to fulfill those promises.

25. As part of this business relationship, EvoHealth would install and implement PACS software for each of MXR's customers, and then provide continued maintenance and support for these systems in the future.

**EvoHealth and Debtor immediately failed to deliver on
their promises, jeopardizing patient information**

26. As it turns out, Debtor never intended to provide continued maintenance and necessary upkeep of the PACS software sold to MXR's customers. Instead, Debtor accepted MXR's money—and that of its customers—and pocketed it rather than using those funds to provide the promised services.

27. Maintaining the remote computer servers that store patient information uploaded using PACS software requires, among other things, internet usage costs, power bills, royalty fees, routine systems checkups, and maintenance by IT professionals.

28. Unbeknownst to MXR, EvoHealth subcontracted with a company called VoXcell Cloud, LLC (d/b/a LifeVoxel.AI or LifeVoxel) to provide administrative functions to support the server infrastructure at several sites that housed information uploaded to EvoHealth's PACS software by MXR customers. These were things EvoHealth had promised to do itself under its contracts with MXR's customers.

29. For instance, LifeVoxel had to triage EvoHealth's servers for MXR's customers to be able to access patient information. Customers were not able to access their medical images for several months.

30. Debtor stopped returning calls for services and support despite representing that EvoHealth would have "fast responses to questions and quick turnaround."

31. Debtor and EvoHealth took MXR's customers' money and abandoned them by not

6

paying for administrative functions to support the servers, the internet usage, and/or the associated royalty fees to keep the servers in good repair.

32. MXR paid EvoHealth millions of dollars over the course of many purchase orders for PACS software on behalf of its customers. None of that money was reinvested into EvoHealth to support the PACS systems and related services in the future. Instead, Debtor used the money to enrich himself.

33. Debtor treated MXR's customers' money as his personal "slush fund" while having no intention of setting monies aside for the future services to be provided or to safeguard against potential corrupt servers and other risks of data loss.

34. Debtor continued to induce MXR to send its customers to EvoHealth while knowing that EvoHealth was not maintaining the software infrastructure to keep fully functional the PACS software they sold to MXR's customers.

35. MXR and its customers justifiably relied on Debtor's misrepresentations that the services they paid for were going to be provided even after the last payment was made.

36. Despite Debtor's representations that EvoHealth would provide continued services during the multi-year contract terms, EvoHealth and Debtor began to not respond to service calls to EvoHealth from MXR's customers associated with the PACS systems.

37. Debtor intentionally deceived MXR and its customers by misrepresenting that he could provide a safe and HIPAA-compliant environment so that MXR would continue to send him new customers.

**MXR's customers experience loss in service**

38. MXR began to receive numerous, repeated complaints and inquiries from its customers due to not having access to patient information, the quality of the systems, and down

servers not being maintained by EvoHealth. For instance, MXR customer CNY Family Care, LLP had documents held hostage by EvoHealth and had no choice but to purchase additional cloud storage to ensure that they would have access to their patient information in the future.

39. Thousands upon thousands of patients were affected. MXR's fear that EvoHealth was failing to maintain the servers was soon a reality when MXR customer Altoona Lung Specialists could not access the cloud infrastructure supported by LifeVoxel to view patient information.

40. On September 20, 2022, LifeVoxel sent out a global letter to MXR's customers notifying them that EvoHealth was not maintaining the servers despite repeated requests to have EvoHealth do so. The letter also attached a copy of a complaint filed by LifeVoxel against EvoHealth in the United States District Court for the District of Connecticut for breach of contract and related claims.

41. In fact, on May 27, 2022 and then June 7, 2022, LifeVoxel alerted Debtor and EvoHealth that a server located at an independent hosted data center in San Diego called NFINIT would soon become non-operational due to instability in the hardware and numerous system administration issues that had been ignored.

42. The June 7, 2022 courtesy notice listed specific action items for EvoHealth to immediately take:

(a) "Add more servers to host more web and rendering service instances to cope with the load (additional hardware is needed)";

(b) "Replace the faulty DB server and restore DB backup (additional hardware is needed, and system administration is required)";

(c) "Evaluate backup storage and restore backup storage if needed (additional hardware maybe needed, and system administration is required)";

(d) "Identify any additional requirements needed once evaluation of the whole system is performed (monitoring and system administration)"; and

8

(e) "Pay for Internet so customers can access the servers."

43. The June 7, 2022 courtesy notice stated that "EvoHealth has been ignoring these servers," that LifeVoxel had "put forth couple of proposals and these are ignored as well," and that "[t]he servers health will ultimately lead to the whole system demise."

44. Unbeknownst to MXR, Debtor and EvoHealth ignored these courtesy notices and took none of the remedial steps recommended by LifeVoxel. In fact, Debtor and EvoHealth continued to accept purchase orders from MXR, putting MXR's customers and their patients' medical information in jeopardy.

45. On one occasion, Debtor's and EvoHealth's failures to maintain the servers or databases containing the information uploaded by MXR's customers resulted in a server failure that affected eight MXR customers and an annual patient volume of more than 5,000 (that is, the volume of exams performed per year based upon the customers' orders).

46. Fees to maintain the NFINIT server had not been paid by EvoHealth since December of 2022. To date, there has not been full rectification for MXR's customers on this issue.

47. In its bankruptcy proceeding (discussed below), EvoHealth blamed LifeVoxel for its own failures to service MXR customers.

48. However, LifeVoxel had previously terminated its contract with EvoHealth due to EvoHealth's continued failure to remit payment in accordance with an agreement between the two entities.

49. On or about February 22, 2023, the NFINIT server failed, resulting in multiple customers not having access to their PACS systems or prior exams of patients, effectively crippling their businesses and negatively affecting patient care.

### MXR rushes to aid its customers at its own expense to fix problems caused by Debtor and EvoHealth

50. Soon after, MXR received numerous calls from its customers stating that Debtor reached out to them, giving them the "run around" and claiming that the outage in service was not EvoHealth's fault and that they should not worry because it would be rectified.

51. Debtor never attempted to rectify these situations for MXR's customers.

52. Revealing his intentional deceit, Debtor eventually told MXR that EvoHealth's employees did not possess sufficient training or documentation to investigate a corrupt server, support the down server, safely manage the databases, migrate patient information, or, navigate the file storage structure, all of which it was contracted to provide.

53. Several MXR customers told MXR that they "felt bamboozled" as Debtor and EvoHealth continued to accept final payments in the months prior to the NFINIT server's failure, leaving them out the remaining balance of the prepaid contracts for storage.

54. MXR's customers have been forced to incur additional costs and seek new vendors. In doing so, many have not used MXR to aid in these efforts due to lack of confidence in MXR, evidencing the damage to MXR's reputation in the industry that has resulted from Debtor's and EvoHealth's conduct.

55. In many other instances, MXR has worked with other PACS software providers to facilitate some restoration of system functionality for its customers, to its own monetary detriment.

56. In addition, MXR and EvoHealth had a negotiated dealer compensation fee, as referenced on the purchase orders—that is, a fee to MXR for bringing EvoHealth customers. EvoHealth owes MXR dealer compensation fees for numerous sites amounting to approximately $100,000.00.

57. On one occasion, MXR paid EvoHealth in full before an installation of PACS

software was to take place on site at MXR's customer Carolina Donor; however, EvoHealth never even started the project and absconded with $24,500.

58. Towards the end of EvoHealth's business dealings with MXR, Debtor continued to send quotes to MXR's customers for PACS software that he knew was never going to be maintained or even installed.

59. As a result of Debtor's and EvoHealth's conduct, MXR has lost significant customers and business and its reputation in the medical imaging industry has been severely damaged.

### EvoHealth files bankruptcy and then hastily dismisses the case

60. On February 13, 2023, EvoHealth filed a voluntary bankruptcy petition under Chapter 11 in the United States Bankruptcy Court for the Eastern District of North Carolina, as Case No. 23-00396. MXR became aware of the bankruptcy on or about February 22, 2023.

61. In its bankruptcy petition, EvoHealth listed its estimated assets at between $100,001 and $500,000, further showing that Debtor was not reinvesting into his business the money Debtor and EvoHealth received from MXR and its customers.

62. Debtor was well aware that there were no monies to disburse or invest in maintaining secured servers. Yet he continued to try and sell PACS software to MXR and its customers mere days before EvoHealth filed its bankruptcy petition.

63. On March 13, 2023, EvoHealth moved to dismiss the bankruptcy case, representing to the bankruptcy court that it intended to dissolve under state law rather than convert the case to a Chapter 7 proceeding. On May 19, 2023, the court granted the motion and dismissed the bankruptcy case.

### MXR files its Complaint against Debtor and EvoHealth

64. On August 7, 2023, MXR filed its Complaint against Debtor and EvoHealth in the United States District Court for the Eastern District of North Carolina, as Case No. 5:23-CV-440 (the "Pending Action"), alleging counts for breach of contract, unjust enrichment, fraudulent inducement, and violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 *et seq.*

65. After Debtor was served with the Pending Action and on the last day for Debtor to respond to MXR's Complaint, Debtor filed his voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on August 31, 2023 (the "Petition Date").

### COUNT I
### Determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A)

66. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

67. Under 11 U.S.C. § 523(a)(2)(A), debts "incurred for money, property, services . . . to the extent obtained by false pretenses, a false representation, or actual fraud," are excepted from discharge.

68. In numerous instances, to induce MXR to make payments to and enter into multi-year contracts with Debtor and EvoHealth, Debtor represented that payments made to Debtor and EvoHealth would pay for legitimate ongoing services supporting the PACS software provided by EvoHealth to MXR and MXR's customers.

69. However, MXR's payments did not go to support legitimate PACS services provided by EvoHealth to MXR and MXR's customers. Instead, payments made by MXR went to Debtor for his individual pecuniary gain. In fact, Debtor knew that he and the other EvoHealth employees did not have the requisite knowledge to fulfill Debtor's contractual promises and

representations.

70. Debtor made these false representations with intent to deceive MXR and MXR's customers in order to induce continued payments to Debtor.

71. Debtor's representations were false and fraudulent.

72. At the time Debtor made these representations, Debtor knew such representations were false and fraudulent.

73. Debtor's representations were reasonably relied upon to MXR's detriment, which paid Debtor.

74. MXR was directly and proximately injured by Debtor's representations and by MXR's reliance on Debtor's representations. These false representations and false pretenses were material to MXR in the course of deciding to purchase EvoHealth PACS systems, use EvoHealth as its PACS services support provider, and make payments to Debtor and EvoHealth. MXR's reliance on Debtor's representations was justifiable.

75. Accordingly, the obligations owed by Debtor to MXR are not dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

## COUNT II
### Determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(4)

76. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

77. Under 11 U.S.C. § 523(a)(4), debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny," are excepted from discharge.

78. Debtor knew that payments made by MXR were made for the purpose of receiving legitimate ongoing services supporting the PACS software provided by EvoHealth to MXR and MXR's customers.

79. Debtor engaged in embezzlement and larceny, in taking the payments made by MXR and using them for purposes other than as required under its agreements with MXR and its customers, with a present and continuing intent to deprive MXR of its funds and the benefits for which it paid Debtor, in order to convert the payments for Debtor's personal benefit.

80. As a result of Debtor's improper receipt and use of the payments made by MXR, MXR suffered damages.

81. Accordingly, the obligations owed by Debtor to MXR are not dischargeable pursuant to 11 U.S.C. § 523(a)(4).

## COUNT III
### Determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(6)

82. MXR restates and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

83. Under 11 U.S.C. § 523(a)(6), debts "for willful and malicious injury by Debtor to another entity or to the property of another entity," are excepted from discharge.

84. Debtor intentionally and wrongfully: (a) obtained and controlled the payments made by MXR for the purpose of receiving legitimate ongoing services supporting the PACS software provided by EvoHealth to MXR and MXR's customers; and (b) used these payments for the individual benefit of Debtor and to the detriment of MXR and MXR's customers, constituting willful and malicious injury by Debtor to MXR or to the property of MXR.

85. As a result of Debtor's willful and malicious conduct, MXR suffered reputational harm and sustained damages.

86. Debtor inflicted the injury on MXR and its property knowing that MXR would be injured by Debtor's wrongful actions or that it was highly likely to occur as a result of his actions. Debtor knew that MXR's customer relationships would be harmed if Debtor failed to maintain the

servers and perform the contracted services. Debtor knew that MXR expected performance in exchange for payment and that MXR would be harmed if Debtor misused its payments.

87. Accordingly, the obligations owed by Debtor to MXR are not dischargeable pursuant to section 523(a)(6) of the United States Bankruptcy Code.

**Wherefore**, MXR respectfully requests entry of an order (i) determining that Debtor's debt to MXR, plus pre- and post-judgment interest at the statutory rate, is nondischargeable in accordance with §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the United States Bankruptcy Code; and (ii) granting to MXR such other relief as is just and necessary.

Filed: November 28, 2023

Respectfully Submitted,

MXR IMAGING, INC.

By: /s/ *Benjamin S. Morrell*
Benjamin S. Morrell (NC Bar No. 56676)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
bmorrell@taftlaw.com

Paul R. Harris (special appearance pending)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH 44114
Telephone: (216) 241-2838
Facsimile: (216) 241-3707
pharris@taftlaw.com

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on the date listed below, I filed the foregoing document using the Court's CM/ECF system, which will effect service upon all counsel of record.

Date: November 28, 2023

> By: /s/ *Benjamin S. Morrell*
> Benjamin S. Morrell
> *Counsel for Plaintiff*